**UNITED STATES**

v.

**CHICAGO MORTGAGE BANKERS ASS'N et al.**

No. 48 C 1826.

United States District Court
N. D. Illinois, E. D.

June 30, 1954.

Willis L. Hotchkiss and Ralph M. McCareins, U. S. Dept. of Justice, Chicago, Ill., for plaintiff.

Castle, Britlinger & Corey, Johnston, Thompson, Raymond & Mayer, Ungaro & Sherwood, Russell & Bridewell, Chester W. Kulp & Joseph Sullivan, Jr., Cummings & Wyman, Edward E. Fleming, Tatge & Jersild, Winston, Strawn, Black & Towner, Thomas A. Reynolds, Carl S. Lloyd, Hammond E. Chaffetz, George H. Dapples, Kirkland, Fleming, Green, Martin & Ellis, Green & Green, George Delbert Gray, Heth, Lister & Flynn, Chicago, Ill., for defendants.

KNOCH, District Judge.

This cause came on for trial commencing on January 19, 1954, and concluding on January 26, 1954, before the undersigned, a Judge of the above named Court, without a jury.

Plaintiff relied entirely on documentary evidence and called no witnesses. Ten witnesses testified on behalf of the defendants, who offered certain documentary evidence as well.

After hearing the evidence adduced by the parties, now pursuant to Rule 52(a) of the Rules of Civil Procedure, 28 U.S. C.A., the Court makes the following findings of fact and conclusions of law:

## Findings of Fact

1. This action was instituted by the United States by the filing of a Complaint on December 9, 1948 under Section 4 of the Act of Congress of July 2, 1890, c. 647, 26 Stat. 209, entitled "An Act to protect trade and commerce against unlawful restraints and monopolies", commonly known as the Sherman Act, 15 U.S.C. § 4, 15 U.S.C.A. § 4, alleging violations by the defendants of Section 1 of the Sherman Act, 15 U.S.C. § 1, 15 U.S.C.A. § 1.

2. Defendant Chicago Mortgage Bankers Association, hereinafter at times referred to as defendant Association, was incorporated under the laws of Illinois on December 8, 1920, and ever since has been an Illinois corporation having its principal office and place of business in Chicago, Illinois.

3. Defendants, other than defendant Association, are hereinafter referred to as defendant members. All of defendant members are corporations.

The name, place of incorporation, and principal place of business of the defendant members are as follows:

| Defendant | Incorporated under Laws of: | Principal Place of Business |
|---|---|---|
| Beesley Realty & Mortgage Company, Inc. | Illinois | Chicago, Illinois |
| Bell Savings and Loan Association | Illinois | Chicago, Illinois |
| Charles H. Brandt and Company, Inc. | Illinois | Chicago, Illinois |
| Robert E. L. Brooks, Incorporated | Illinois | Chicago, Illinois |
| Central National Bank in Chicago | United States | Chicago, Illinois |
| Chicago City Bank and Trust Company | Illinois | Chicago, Illinois |
| Chicago Federal Savings and Loan Association | United States | Chicago, Illinois |
| Chicago Mortgage Investment Company | Illinois | Chicago, Illinois |
| Dovenmuehle, Inc. | Illinois | Chicago, Illinois |
| Draper and Kramer, Incorporated | Illinois | Chicago, Illinois |
| First Federal Savings and Loan Association of Chicago | United States | Chicago, Illinois |
| First National Bank and Trust Company of Evanston | United States | Evanston, Illinois |
| General Mortgage Investments, Inc. | Illinois | Chicago, Illinois |
| Great Lakes Mortgage Corporation | Illinois | Chicago, Illinois |
| Greenebaum Investment Company | Illinois | Chicago, Illinois |
| Home Federal Savings and Loan Association of Chicago | United States | Chicago, Illinois |
| Henry P. Kransz Company | Illinois | Chicago, Illinois |
| Merchants National Bank in Chicago | United States | Chicago, Illinois |
| Midwestern Mortgage Company | Illinois | Chicago, Illinois |
| The Mutual National Bank of Chicago | United States | Chicago, Illinois |

| Defendant | Incorporated under Laws of | Principal Place of Business |
|---|---|---|
| National Bank of Commerce of Chicago | United States | Chicago, Illinois |
| National Boulevard Bank of Chicago | United States | Chicago, Illinois |
| Oak Park Trust and Savings Bank | Illinois | Oak Park, Illinois |
| H. F. Philipsborn & Co. | Illinois | Chicago, Illinois |
| F. C. Pilgrim & Co. | Illinois | Chicago, Illinois |
| Quinlan and Tyson Mortgage Corporation | Illinois | Chicago, Illinois |
| Republic Realty Mortgage Corporation | Illinois | Chicago, Illinois |
| Charles Ringer Company | Illinois | Chicago, Illinois |
| The South East, National Bank of Chicago | United States | Chicago, Illinois |
| South Side Bank & Trust Co. | Illinois | Chicago, Illinois |
| State Bank and Trust Company | Illinois | Evanston, Illinois |
| Uptown Federal Savings and Loan Association of Chicago | United States | Chicago, Illinois |
| Washington National Insurance Company | Illinois | Evanston, Illnois |
| Western National Bank of Cicero | United States | Cicero, Illinois |
| Percy Wilson Mortgage and Finance Corporation | Illinois | Chicago, Illinois |

4. All of the defendant members have, at least since 1940, engaged in the business of making real estate mortgage loans in an area including Chicago and within a radius of fifty miles thereof, hereinafter referred to as the Chicago area. All of the defendant members have been members of the defendant Association since January 11, 1943, and were members on the date of the filing of the complaint. Twenty-nine of the defendant members have been members of the Association at least since 1941. Some of the defendant members have been members of the Association since 1936.

5. Since December 9, 1920, the by-laws of the defendant Association have stated the objects of defendant Association to be:

* * * to promote the interests of those engaged in the business of loaning money upon real estate and of those engaged in the business of buying and selling mortgages secured by real estate, and to better safeguard and protect the borrower on real estate and the investor in real estate mortgage securities.

The defendant Association and thirty-five of its members, all of whom are corporations, are accused, according to the complaint, of having "engaged in a combination and conspiracy to suppress and eliminate competition among the members of the Association in making mortgage loans and to stabilize mortgage loan rates and charges of said members in restraint of * * * trade and commerce in violation of Section 1 of the Sherman Act." The specific charges of the complaint and also the plaintiff's proof relate, however, for the most part to matters pertaining to Federal Hous-

ing Administration (FHA) mortgages in respect to which the Federal Housing Administration at all times since the National Housing Act, 12 U.S.C. 1701 et seq., 12 U.S.C.A. § 1701 et seq. became effective, has fixed maximum rates of interest and other charges and has otherwise exercised close supervision. To engage in the business of making such loans a mortgagee, at all times material hereto, has required approval by the Federal Housing Administrator.

6. The period covered by the allegations of the Complaint and by the plaintiff's proof was from 1936 to the date of filing of the complaint in December, 1948.

7. One of the specific charges of the complaint, and the one most stressed by the plaintiff at the trial, is that most, but not all, of the defendant members of the Association, together with more than twenty other members who were not made defendants, in 1943, signed separately so-called "Ballots", one of which is identified as P.Ex. 67, which provided basically that "The undersigned organization wishes to signify its willingness to stabilize the practice of not paying more than par for unprocessed Title II FHA loans." It appeared from the evidence that this was understood by the signers to mean that they would not pay "premiums" for this specific type of FHA loans.

8. The evidence further showed that premiums were very seldom paid for such loans by FHA–approved mortgagees, 90% or more of whom, including the principal mortgage companies, banks and Savings and Loan Associations, never paid them at any time. In the few instances where such premiums were paid, they almost invariably were paid to a real estate broker, builder or other person as a "Finder's Fee," for referring the borrower to the mortgage lender. This was regarded by the Association and its FHA–approved mortgagee members as an unnecessary and unearned fee and the purpose of the ballot was primarily to discourage the payment of such fees and thus to eliminate what was felt to be an unwise and unsound practice, or potential practice, of a very few of such mortgagees.

9. When premiums were paid for these loans they were usually on the order of 1% of the amount of the loan. If the completed loan was later sold to an investor the price and terms upon such sale were ordinarily not affected by the payment or non-payment of such premiums, or, if they were affected at all, the effect was so slight as to be practically negligible. The agreement "to pay not over par" for the unprocessed loans did not fix, or materially (if at all) affect, the price at which the completed mortgages were sold (in cases where they were sold instead of being made for investment by the mortgagees).

10. The agreement did not lessen competition in, or impose any restraint upon, interstate commerce or trade in said Title II FHA loans.

11. Said agreement was never strictly observed or made fully effective and it was completely terminated in April of 1947 when the Association, on direction of its then president, after consulting the members of its board of directors, ceased to request new members who were FHA–approved mortgagees to sign such agreement. Several such mortgagees were subsequently admitted to membership in the Association without signing the agreement, which was conditioned on its being "consented to" by every such member. The agreement was never reaffirmed after March 27, 1946, as it was on that date and on at least one other prior occasion subsequent to 1943.

12. Every witness for the defendants who was asked about it testified that he had regarded the agreement as completely dead since the spring of 1947, and there was no evidence or indication of any intent on the part of any of the defendants or other members of the Association to resume or continue it.

13. The defendants and the other members of the Association at all times material hereto were a minority of the FHA–approved mortgagees in the Chicago area, and there were at all such

times many mortgage lending agencies, including most banks and Savings and Loan Associations who were not members of the Association.

14. FHA mortgage loans are, and at all material times have been, much less in volume than so-called "conventional" mortgage loans. In 1947, for example, Title II FHA mortgage loans constituted only about 3% of all non-farm mortgages of $20,000 or less recorded in Illinois. Conventional mortgage loans at all material times have been in competition with FHA loans.

15. Although the defendants as a group or the members of the defendant Association as a group have at times material hereto enjoyed a sizeable volume of the origination of Title II FHA loans, this in itself does not indicate that they have dominated the mortgage loaning business in the Chicago area either in respect to FHA loans or conventional loans.

16. The business and activities of the defendants in the making and origination of mortgage loans in the Chicago area were at all material times and are now essentially local in character and, so far as any matters and things shown by the evidence are concerned, had but little, if any, effect on interstate commerce.

17. The defendants are charged with having entered into agreements fixing minimum commissions, service charges and interest rates on FHA mortgage loans but the evidence fails to show that any such agreements were made, or that any action having the force of such an agreement was taken, by the defendants, or any of them.

(a) In 1942, and again in 1944, certain recommendations were made at meetings of CMBA members interested in construction loans under Title VI of the National Housing Act in respect to minimum commissions on such loans, and it was suggested to the members to give serious consideration to such matter, which did not constitute, or operate as, agreements; the evidence not only does not show uniformity, but affirma-tively shows lack thereof, in respect to such commissions at the times in question; the evidence offered on this subject covered a period in the past and there is no indication of any such suggestions or recommendations for a considerable time before the filing of the complaint; and there is no threat or likelihood of resumption of said recommendations.

(b) There was no evidence of any agreement or other concerted action, or any attempted action, by the defendants, or any of them, in respect to interest rates on FHA or other mortgages; the principal item of evidence offered by the plaintiff on this subject related only to a discussion by a certain unidentified group of FHA mortgagee members in which it was agreed that they were opposed to the reduction by the Government of the then-existing maximum rate on FHA construction loans; and it was shown that mortgage interest rates are, and at all times material hereto have been, determined by forces beyond the power of the defendants or the members of the defendant Association to control.

18. The charge of the plaintiff that the facilities of the Association were utilized to discourage refinancing by borrowers was not proven by the evidence. The documents offered on this subject were dated a considerable length of time before the filing of the complaint, and the actions referred to showed no indication nor intent to follow through.

19. The policy of the defendant Association and its members on the subject of advertising of interest rates and charges, or the absence of any charge, is fully embodied in the Association's Code of Ethics adopted in 1940 (contained in P.Ex. 188). The provision on this subject in the Code does not prohibit or disapprove such advertising provided it is accurate, complete and such as to avoid misleading prospective borrowers. There was no evidence to indicate any kind of restraint of trade growing out of this provision.

20. The charge of alleged restraints on soliciting mortgage loans grows out

of another provision of the Association's Code of Ethics, namely a provision that it shall be unethical for any member to solicit a loan knowing that an application for a loan on the same property has been signed elsewhere by the same applicant and remains in effect. This was similar to what the FHA itself requires in connection with refinancing of FHA loans, and has had no restraining effect on trade in the mortgage business.

21. The alleged "policing" actions of the Association were not shown to have had any influence in the direction of restraint of trade and are found not to have done so.

22. The diverse, fragmentary and disconnected documentary evidence, much of it widely separated in time, which was offered by the plaintiff without supporting testimony to show its true significance or practical effect, is found to be inadequate to show any contract, combination or conspiracy to restrain trade on the part of the defendants or any of them.

23. All of the alleged acts and practices of the defendants charged in the complaint, in so far as the latter is sustained by the evidence, with the exception of said Code provisions, have been discontinued many years ago and there is no threat or likelihood of the resumption of any of them.

24. It is found that neither the Association nor any of the other defendants has had the intent to restrain trade or create a monopoly in the mortgage business in the Chicago area, or has done so with respect to any of the matters charged in the Complaint.

### Conclusions of Law.

1. The defendants have not violated Section 1 of the Sherman Act as charged in the complaint.

2. None of the alleged actions of the defendants, or of any of them, so far as established by the evidence, constitutes a "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations" such as are declared to be illegal by said Section 1 of the Sherman Act.

3. None of such actions has had any substantial or adverse effect on interstate trade or commerce as required by the controlling decisions in order to make out a case of violation of the Sherman Act.

4. The plaintiff is not entitled to any of the relief sought in the complaint, and the complaint should be dismissed.